PHILEMON THOMAS *v.* HENRY KEAN.

After the argument has commenced no further evidence can be introduced, but by
the consent of both parties.  C. P. 484.

Where a bill of exceptions is insufficient to enable the court to test the correctness
of the decision of the inferior tribunal, its judgment will be presumed to have
been correct.

Where it does not appear from a paper offered in evidence, purporting to be a copy of
an authentic act, that the original was signed by two witnesses, it cannot be ad-
mitted in evidence as the copy of an authentic act.   An act is not authentic
which wants the signature of either of the witnesses required by article 2231 of
the Civil Code.

One holding under a vendor who sells only his right and title to the property, can-
not plead prescription.

APPEAL from the District Court of East Baton Rouge, *John-
son,* J.

GARLAND, J.   The plaintiff claims two hundred acres of land
as belonging to him, being part of a larger tract situated on
Ward's creek, of which he alleges the defendant has taken pos-
session, and that he sets up title thereto.   The defendant, in his
answer, after a general denial, says that he is not in possession
of any land belonging to the plaintiff, nor that ever did belong

to him ; but that he is in possession of one hundred acres of land, purchased at the sale of the estate of one Denham, which rightfully belongs to him.   He set forth his claim of title as derived from one John West, by an assignment of whose settlement right the plaintiff got the land confirmed to him.   The defendant pleads the prescription of ten years, by virtue of possession in him and those under whom he claims.   In a supplemental answer, he sets up the loss of a deed from John West to one Fountain Nash Mason, which forms one of the links in his chain of title, for the purpose of enabling him to give parol evidence of its contents.

The evidence in the case shows, that John West, on the 23d of July, 1819, sold to William Hood, " a certain improvement on the east fork of Ward's creek, on condition, that if said Hood shall obtain a title for said land from the government of the United States, he binds himself to pay or deliver to John West, one hundred acres of said land, exclusive of the improvements now made by William Hood and Charles Powers, in any part that the said West may choose."   This sale was recorded in the parish judge's office, on the 23d of September, 1826, at the request of the plaintiff, and the original was returned to him, it being an act *sous seing privé.*   On the 21st July, 1822, William Hood and the plaintiff entered into an agreement by an act under private signature, which stipulates that the former had sold to the latter the tract of land on which he (Hood) resided, on the east fork of Ward's creek, called West's improvement ; the whole tract containing six hundred and forty acres ; " one hundred acres is reserved for West ;" and for the balance, Hood binds himself to transfer the certificate of confirmation as soon as it can be obtained from the United States commissioners. This act was signed by two witnesses, who on the 7th February, 1823, appeared before the parish judge, and on oath acknowledged their signatures, and declared, " that the parties to said act did declare that it was their own act for the purpose therein set forth."   This acknowledgment was attested by the judge, and the act recorded the same day.   With this act from Hood, the plaintiff presented himself to the land commissioners of the district, to whom the claim of Hood and Gurley, founded

on West's *improvement*, had been previously presented, and upon it, and the admission and assent of Gurley that the transfer was correct, a certificate of confirmation was issued in the name of the plaintiff, in June, 1823, without any condition or qualification; and directions were given as to the manner the claim shall be surveyed and located. It was accordingly surveyed and located in the name of the plaintiff, and represented on the township map; but at what particular period is not proved. On the 27th of August, 1823, the plaintiff entered into a penal obligation with William Nash, the condition of which states, that he had agreed to sell him, all his right and interest in and to two hundred acres of the land on Ward's creek, known and obtained by virtue of John West's improvement, and that he is to make such a title as the government shall make to him, whenever Nash shall pay the price. The tract is to have eight acres front on the creek by twenty-five deep, and is to be bounded on the upper side by the tract of Charles Powers. Subsequently this land was seized by the sheriff, under an execution against Nash, and he bought it on twelve months credit. In the sale it is described as being bounded on the north by Powers, and the same purchased of the plaintiff. This was in February, 1824. On the 2d day of September, 1826, at a probate sale of the property of William Nash, the plaintiff purchased all the right, title, and interest of said Nash in and to the tract of land of two hundred acres on Ward's creek, the title being founded on the improvement of John West, adjoining the land of Pyburn. A small portion of the price was paid in cash, and the remainder retained by the purchaser to go in discharge of so much of the claim as the purchaser had against Nash's estate.

This statement contains all the documentary evidence on the part of the plaintiff; and it may be here remarked, that according to the agreement to sell, made between the plaintiff and Nash, the two hundred acres of land were situated on the northern or upper part of the tract, and included the land in controversy, but from the description in the probate sale, the land purchased by the plaintiff is on the southern or lower part of it.

The documentary evidence offered by the defendant, is an adjudication made at a probate sale of the estate of Fountain

Nash Mason to Hippolyte Lanone, on the 18th of August, 1829, "of all the right, title, and interest of the deceased, in and to a certain tract of land situated on Ward's creek, containing one hundred superficial acres, being a part of a section of land of six hundred and forty acres, transferred by William Hood to Philemon Thomas, with the reservation of the hundred acres as described above, which was sold by John West to Fountain Nash Mason." On the 25th of January, 1830, Lanone, by an authentic act, sold to Shields, all his rights to a "parcel of land on Ward's creek, containing one hundred superficial acres, being part of a section known as West's improvement," which tract was acquired at the sale of the estate of F. Nash Mason, as will more fully appear by the adjudication. On the 25th of January, 1836, Shields, by an authentic act, sold and transferred with a warranty, to R. M. Denham, the same parcel of land, describing it in the words of the deed to him, which is specially referred to. On the 29th of March, 1841, at the probate sale of Denham's estate, the defendant became the purchaser of a tract of land " containing one hundred superficial acres, situated on the east fork of Ward's creek, bounded by lands of A. Adams below, those of the widow Powers above, west by lands of the widow Lobdell, and east by those of Gen. Thomas," the plaintiff. Under this sale, the defendant took possession of the land in controversy. In none of the previous acts of sale under which the defendant claims, is there any specification of the boundaries of the one hundred acres claimed by him. They include the land in controversy, and the sale is unconditional. In addition to the uncertainty in this chain of title, there is no written act of sale from John West, or any other person to Fountain Nash Mason, deceased. This defect is supplied by parol testimony, admitted under the allegations in the supplemental answer. Judge Tessier says, " that at the request of William Nash, he made a private act of sale from him to Fountain Nash Mason, who was then a minor, of a hundred acres of land reserved out of a larger tract of land, an improvement derived from West, in case it should be confirmed. Saw the act after the death of Nash, and Fountain Nash Mason. He searched in his office for it, but could not find it, after their death. He

searched for it deligently among the loose papers in his office, but could not find it. It was not recorded. It was 18 or 20 years since, he does not recollect the exact year. Nash did not wish it recorded. It was signed by the parties. He thinks, that it was before 1826, that he wrote the act." Bryan says, " that he saw a paper in the judge's office—a loose sheet of paper, purporting to be a sale of one hundred acres of land, from John West to Fountain Nash Mason, and believes that, at the time, he made them out a copy of it. Knows nothing of its loss. Has never seen it since. He understood it to be the hundred acres of land which West reserved in his sale to Hood. It was sometime since 1830, and since the death of William Nash and F. Nash Mason, that he last saw the act, when he took a copy of it in Judge Tessier's office, at Judge Tessier's request. Has no recollection that he made more than one copy of said act. Does not recollect the signatures, or whether he saw the name of John West more than once. He copied the paper shown him, mark T, and also another which purported to be a sale from West to Nash. He understood from the act of sale, that it was for the 100 acres which West reserved when he sold or conveyed the tract to Hood. Fountain Nash Mason was understood to have been the natural son of William Nash." Mr. Patterson says, he searched diligently with Judge Tessier, for the act of sale from John West to Fountain Nash Mason, and could not find it. The search was made in the office of the judge.

Mrs. Hill swears, that the hundred acres of land reserved in favor of West, lay in the north west corner of the tract adjoining Powers, and takes in the improvement of West. That a drain that runs between the improvement of William Hood and John West was the conditional line between them, as told to her by Hood. The plaintiff told her, that he sold to William Nash that part of the section that took in the improvement of William Hood: and Nash told her he intended to purchase the hundred acres from West, for his son Fountain M. Nash, after he had purchased the improvement from Thomas.

Pyburn says, that he knows the section of land known as West's improvement, and knows where the improvements of Hood and Nash were situated on it. Hood was situated inside

of where Adams' field now is.    West's improvement was about half way from Pyburn's to Powers line.    It was on the west side of the section, about 200 yards above Hood's, and about 400 yards from Powers' line.    The improvement of West was about 150 yards from where the defendant's house now stands.    Both Hood and West have often told him, that a large beech near the creek was the line between their land.    Nash's improvement was nearly between West's and Powers' line.    He says that John West, under whom the defendant claims title, was then in the court-house.

We have stated the evidence very fully, and as accurately as possible from the manner the record has been made up ; the evidence given on the two trials, having been improperly copied and mixed together, so as to make it difficult to understand precisely what was used on the last trial.    There was a judgment in favor of the defendant, and the plaintiff has appealed.

Before proceeding to the merits of the case, our attention has been directed to certain bills of exception.    The first is to the opinion of the court refusing to permit John West to be examined as a witness for the defendant.    He had had him summoned, but did not offer him as a witness, and the counsel for the defence closed their testimony.    The counsel for the plaintiff then asked a witness if West was not then in the court-house, who answered affirmatively, whereupon the plaintiff's counsel closed their evidence also, and it was so entered on the record.    At some period subsequent to this, but at what precise time the bill does not state, the counsel for the defendant tendered West as a witness.    He was objected to by the counsel for the plaintiff, on the ground that the defendant had closed his evidence. The court sustained the objection, and the defendant excepted. The bill does not state whether the argument had commenced or not.    If it had, article 484 of the Code of Practice says, that " no witnesses can then be heard, nor proof introduced, except with the consent of all parties."    In the absence of any negation in the bill that the argument had commenced, we must presume that it had, otherwise the judge would, we suppose, have admitted the witness to testify, if he were competent, or not objected to for some sufficient reason.    When bills of ex-

ception do not sufficiently state the grounds of exception, so as to enable us to test properly the correctness of the opinions of the judge below, we must presume that he decided correctly.

The next bill states, that the plaintiff offered in evidence the adjudication to him at the probate sale of William Nash, which was objected to by the defendant's counsel, on the ground that it was not a copy of an authentic act, as from it the original did not appear to have been signed by two witnesses, nor to have been clothed with the formalities of an authentic act. These objections were overruled, and the exception taken. We think the court erred in admitting this copy in evidence as being authentic. Article 2231 of the Civil Code says, that an authentic act is one which has been executed before a notary public, or other officer authorized to execute such functions, in presence of two witnesses, free, male, and aged at least fourteen years, or three witnesses if the party be blind. This court in 8 Mart. N. S. 502, and 11 Mart. 243, have said that an act is not authentic, that wants the signature of either of the witnesses. From the copy produced two witnesses are named in the body of the act as being present, but only one signed his name.

By the sale from West to Hood, the whole section was transferred to the latter; and upon a certain contingency, to wit, that of a title being obtained from the United States, he was to deliver to West one hundred acres in any part he might choose, so that he did not interfere with the improvements made by Hood or Charles Powers. The plaintiff became possessed of the whole tract by the sale from Hood, subject to the same reservation; but in the confirmation by the United States to the plaintiff, which completed his title, nothing is said of a reservation, and the claim to it rests upon the previous agreements. That West had a right to select one hundred acres out of the section after it was confirmed, is undeniable; but the question is, did he ever do it? We see no sufficient evidence in the record to convince us that he ever did. It is not shown that he ever called on the plaintiff to deliver him the one hundred acres, nor that he ever had it surveyed by any one. He continued to live at the same place, subsequent to the confirmation, that he occupied before; and nothing is proved as to the position of the

beech tree, and the *drain* said to have been fixed on as boundaries, to enable us to say whether more or less than one hundred acres are comprised within such limits. The surveyor, who, under the order of the court, ran out the boundaries claimed by the defendant, says, that he does not know whether more or less than one hundred acres are included in them, as he made no calculation of the quantity, not being instructed to do so. It is further to be observed, that the plaintiff has never admitted these boundaries to be correct, or to have been established with him. Their existence rests upon the statements of Hood, who had no right, after he had sold to the plaintiff, to fix them; and and it is not probable that he fixed them before, as he had sold to the plaintiff before the contingency occurred upon which West had the right of making a selection. The evidence of Pyburn further shows, that no selection was made, as the settlement of Nash was on the land now claimed by the defendant, it being between the improvement of West and Power's line, which is within the boundaries spoken of by Mrs. Hill. Our impressions are further confirmed, as to the want of any selection by West, from the absence in all of the deeds of any state ment as to any particular location of the one hundred acres. It is not mentioned in any conveyance, except that under which the defendant immediately claims. Besides this, no one ever sold this reservation with a warranty, until Shields sold to Denham, in 1836.

We are of opinion that the penal bond which the plaintiff gave William Nash, did not divest him of his absolute title to the two hundred acres agreed to be sold. No title or sale by authentic or private act was to be made, until the price was paid, which never was done, so far as we are informed. It was an agreement to sell when a price should be paid; but as the plaintiff seems to have considered it in a great degree binding, and undertook to re-acquire the land by purchasing it again, it is possible, that he may have received a portion of the price, and thus have made the obligation to sell more onerous and binding.

On the part of the defendant, the evidence of the loss of the deed to Fountain Nash Mason is very weak; and as to who the

deed was signed by as vendor, the two witnesses contradict each other; and some of their statements show that their recollection is very indistinct. Judge Tessier says that he wrote the deed, and that William Nash was the vendor, and Mason the vendee, who was a minor. He has seen the act of sale since the death of both parties, but cannot now find it in his office. Bryan, the other witness, says that the sale was from West to Fountain N. Mason, and he "believes that, at the time, he made a copy of it for them." Sometime since 1830, and since the death of both Nash and Mason, he last saw the act, and then made a copy of it in Judge Tessier's office, at his request. If the statement of Judge Tessier be true, it is not shown what has become of the sale from West to William Nash, nor whether one ever existed. The defendant claims West's reservation, and shows no deed from him to William Nash, who, the witness says positively, conveyed to Mason by a deed never recorded. If Bryan's statement be correct, then, at least, one, and probably two copies of the act have been made ; and it is not shown that they have been lost. No inquiries appear to have been made of any of those under whom the defendant claims, to ascertain whether they, or their representatives have, or have not the original act, or a copy, which would be better evidence, in case of the loss of the original, than the vague recollections of witnesses, who are called on to state what occurred 18 or 20 years ago.

As the case is now presented to us, we are not satisfied with the judgment given below, and, we think, that the ends of justice will more probably be obtained by remanding it for a new trial.

As to the plea of prescription, we are of opinion that it cannot avail the defendant. None of the sales previous to that from Shields to Denham, dated in 1836, are acts translative of property. They are sales of only the right and title of the various vendors to an uncertain thing, which we have held not to be a basis for the plea of prescription. 3 Rob. 220.

It is, therefore, ordered and decreed, that the judgment be annulled and reversed, and the case remanded for a new trial, with directions to the judge to conform in the trial thereof, to the prin-

ciples herein mentioned, and otherwise proceed according to law ; the defendant paying the costs of this appeal.

*Elam*, for the appellant.

*Paterson* and *Brewer*, for the defendant.